**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Terrica Jennings                              )
                          Plaintiff,          )
              v.                              )
                                              )     Case No.: 1:24-cv-00329
District of Columbia, et. al.                 )
                          Defendants.         )

~~UNITED STATES DISTRICT COURT~~
~~FOR THE DISTRICT OF COLUMBIA~~

~~TERRICA JENNINGS~~                          )
~~3 Tingey Square, SE~~                       )
~~Apt. 906~~                                  )
~~Washington DC 20003~~                       )
~~Plaintiff,~~                                )
                                              )
                                              )     ~~Case No. 1:24-cv-00329~~
~~v.~~                                        )
                                              )
                                              )
~~DISTRICT OF COLUMBIA~~                      )
~~c/o Office of Attorney General~~            )
~~400 6th Street NW~~                         )
~~Washington, D.C. 20001,~~                   )
~~and~~                                       )
                                              )
~~MARGARET COLLEEN CURRIE~~                   )
~~c/o Office of Attorney General~~            )
~~400 6th Street NW~~                         )
~~Washington, D.C. 20001,~~                   )
~~Defendants.~~                               )

**AMENDED COMPLAINT FOR DAMAGES**

Page 1 of 33

Jennings v. DC Government
Complaint for Damages

Ms. Terrica Jennings, Plaintiff, by and through her counsel, brings this action against Defendants, District of Columbia, and Margaret Colleen Currie, collectively and individually, for creation of hostile work environment based on gender and race; discrimination based on gender and race; and retaliation in violation of federal civil rights and District of Columbia law. In support of the Complaint, Ms. Jennings alleges the following:

<u>NATURE OF THE ACTION</u>

Ms. Terrica Jennings (hereinafter, "Ms. Jennings") is an esteemed attorney whose career is defined by her academic excellence and dedication to public service. As a graduate of Howard University and Stetson University Law School, with further legal studies at Harvard University, she has been recognized for her significant contributions to the Washington D.C. government. Notably, Ms. Jennings was honored with the National "Clearie" Award by the U.S. Election Assistance Commission for her outstanding work.

Ms. Jennings' commitment to democracy is evident from initiatives she's launched in the District of Columbia, such as the "Register! Educate! Vote! Use Your Power!" campaign and the annual Voting Accessibility and Language Access Forum, which have profoundly impacted voter accessibility and participation. Her efforts have earned public acclaim and have set a standard for inclusive electoral processes in Washington, DC.

Despite her distinguished record and commitment to the public sector, Ms. Jennings experienced continual discriminatory employment practices at the District of Columbia's Office of Administrative Hearings. Ms. Jennings began her employment with the Office of Administrative Hearings as a deputy general counsel in the spring of 2021. During her first in-

Jennings v. DC Government
Complaint for Damages

person meeting with Chief Administrative Law Judge Colleen Currie, the director of the Office of Administrative Hearings, Ms. Currie derided a significant amount of Ms. Jennings' African-American colleagues, many of whom Ms. Jennings had not physically met at this point. During this meeting, Ms. Currie spewed commonly-used derogatory stereotypes for African-Americans in whole and African-American women, specifically.  For instance, Ms. Currie condemned the competence of Black workers in the office, ridiculed the Black women for dressing sexually suggestive, insulted the intelligence of Black workers in the office, and alleged sexual relationships among the Black workers. Ms. Currie only insulted the Black employees to Ms. Jennings – many of whom Ms. Jennings either supervises or works with directly in other capacities.

Ms. Jennings objected to Ms. Currie's characterizations about the employees and requested the conversation to be kept in a professional manner. Following Ms. Jennings' objection to her conduct and reporting the matter to Human Resources, Ms. Currie initiated a series of hostile and retaliatory actions. These actions included ceasing communication with Ms. Jennings; isolating her from colleagues by instructing them not to speak with her; unjustly accusing her of insubordination despite corrections from colleagues; withholding training opportunities; reallocating her job responsibilities; failing to provide fair compensation commensurate with similarly situated deputy general counsels across the DC government; and offering her an interim General Counsel position without equal pay to the previous male General Counsel. Additionally, Ms. Currie conveyed that the General Counsel role would be a title-only

Jennings v. DC Government
Complaint for Damages

position with no real authority, which departs from the conditions under the previous male who occupied the role.

This hostile and humiliating treatment continued for over a year and a half.  When Ms. Jennings complained to the Mayor's Office of Legal Counsel (MOLC) about Ms. Currie's conduct, the government retaliated by suspended her for six months. The government's conduct toward Ms. Jennings exacerbated her medical ailments, including causing her severe anxiety from dealing with Ms. Currie's ridicule, isolation, underpay, and being kept out of her profession via the suspension for half of a year.  Through this complaint, Ms. Jennings seeks to address these grievances and to uphold the principles of equality and fairness that have guided her professional life. The particulars of her claim against the Office are detailed herein.

## PARTIES

1.      Ms. Jennings is a resident of Washington D.C.

2.      Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs District agencies, including the D.C. Office of Administrative Hearings pursuant to the laws of the District of Columbia.

3.      Margaret Colleen Currie is the Chief Administrative Judge for the D.C. Office of Administrative Hearings. At all relevant times in this dispute, Ms. Currie was an officer of the District of Columbia in the capacity of Chief Administrative Judge for the D.C. Office of Administrative Hearings.

## JURISDICTION AND VENUE

Jennings v. DC Government
Complaint for Damages

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions.

5.    Plaintiff's claims under the law of the District of Columbia arise from the same events as the constitutional claims and are therefore within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.    Venue is proper in this Court because the events that gave rise to this action occurred in the District of Columbia.

7.    This Court has personal jurisdiction over Defendants because they are instruments of and/or employees of the local government of the District of Columbia during all times relevant to this Complaint, and they were engaged in the relevant conduct in the District of Columbia.

8.    Plaintiff exhausted administrative remedies by filing an action in the EEOC and obtaining a Right to Sue letter on November 6, 2023.

**STATEMENT OF FACTS**

9.    During the times relevant to this matter,  Ms. Jennings was an employee of the District of Columbia's Office of Administrative Hearings and reported to Defendant Margaret Colleen Currie, Chief Administrative Law Judge at the Office of Administrative Hearings.

10.    Ms. Jennings is Black Caribbean-American.

11.    Ms. Jennings had been an employee in different capacities of the District of Columbia government since May 3, 2015.

12.    Ms. Jennings was hired as a Deputy General Counsel for the District of Columbia's Office of Administrative Hearings (hereinafter, "OAH") on March 14, 2021.

Jennings v. DC Government
Complaint for Damages

13.    When Ms. Jennings began her employment with OAH, she was initially tasked with providing legal advice and support to OAH General Counsel, Mr. Louis Neal, Ms. Currie, and all department managers and supervisors. Ms. Jennings also directly supervised the Office of General Counsel's legal support staff, oversaw the appellate department, tracked legislation, and drafted various contractual legal documents and legal correspondence. Ms. Jennings, along with Mr. Neal, also served as legal liaisons to over forty (40) District of Columbia agencies, the District of Columbia Council, Congressional Committees, private sector entities, constituent groups, and other shareholders.

14.    Because of the COVID-19 pandemic, Ms. Jennings teleworked 100% of the time from the start of her employment with OAH until June 2021.

15.    As a result of her telework, Ms. Jennings did not have any in-person contact with Ms. Currie until approximately June of 2021.

### INAPPROPRIATE COMMENTS ABOUT COLLEAGUES

16.    Ms. Currie requested to meet with Ms. Jennings shortly after the agency returned to working in the office.

17.    During this meeting, Ms. Currie provided her impressions, assessments, and gossips about several Black and Black female employees Ms. Jennings supervised, as well as Mr. Neal, to whom Ms. Jennings directly reported.

18.    During this initial meeting, Ms. Currie degraded Ms. Jennings' Black colleagues, using commonly derogatory African-American stereotypes about work ethic, intelligence, and sexuality to describe who Ms. Jennings would be working with and supervising at OAH. Since

Jennings v. DC Government
Complaint for Damages

this was early in Ms. Jennings' on-site work, and overall employment with the agency, she was introduced to her colleagues by way of these degrading remarks before she physically met them.

19.   Ms. Currie said the following statements to Ms. Jennings about her colleagues:

• "Breanna Walker just walks around in her short skirts, bending over and showing her ass." Ms. Currie explained that Ms. Walker had a reputation for being extremely flirtatious and was possibly too friendly and possibly engaging in an unprofessional relationship with Judge Robert Hildum, for whom she worked privately as a babysitter. From Ms. Currie's perspective, Ms. Walker would sit in Judge Hillman's office for long periods – actions that she thought were inappropriate.

• "Joseph Harrison is old and useless, and the agency should have gotten rid of him a long time ago." Ms. Currie's assertion was that Joseph "Joe" Harrison was not very smart and was only able to assist with matters involving the Department of Public Works (DPW) and he needed to retire/resign. Ms. Currie also mentioned that she hated having to interact/speak to Mr. Harrison who sat next to her previous office, when she was an Administrative Law Judge (ALJ), prior to her being appointed to the CALJ position. She also discussed how the Clerk made a huge mistake to promote Mr. Harrison to Deputy Clerk of Court because he was never smart enough for anything beyond what he was doing, and she was happy when they took the position away.

Jennings v. DC Government
Complaint for Damages

- Ms. Currie also disrespected Darrell Cash, who works for the Clerk's Office, by claiming he wanted one of the Deputy Clerk positions, but "it would never happen." Ms. Currie complained that he was always absent from work and taking time off because of his "leg issue." Mr. Cash is an amputee with a qualifying disability.

- "Kim is the dumbest person on your team…." Here, Ms. Currie referenced Kimberly "Kim" Webb.[1] Ms. Currie also asserted that when she was an administrative law judge, she avoided working with Ms. Webb at all costs because she was so "dumb." Ms. Currie also complained to Ms. Jennings that Ms. Webb was a "single mom" and would sometimes bring her daughter to the office, which she thought was inappropriate.

- Ms. Currie made several derogatory statements about Black female administrative law judges, including Deborah Carroll, Yewande Aderoju, Maxine E. McBean, Alexis Taylor, Millicent Newhouse, Calonette M. McDonald, and Leslie Meek. She referred to them as "dumb, " "unintelligent," and repeatedly questioned their qualifications for their roles. Ms. Currie even openly yelled "I hate Leslie Meek." Judge Meek was appointed as an Associate Judge for the Superior Court for the District of Columbia in 2022.

---

[1] During the following months Ms. Webb worked for OAH, Ms. Currie mentioned on several occasions to Ms. Jennings that Ms. Webb was absolutely the most incompetent person on the team that she inherited.

Jennings v. DC Government
Complaint for Damages

20.     To add to the litany of racist and sexist descriptions, Ms. Currie claimed that the "legal assistants aren't very smart" and "the only one that's good is Joe [Mangan] and that's why he's going to be my assistant."

21.     Joseph "Joe" Mangan was the only white paralegal under Ms. Jennings supervision at that time.  Mr. Mangan was also the only member of Ms. Jennings team that Ms. Currie described with any respect. Ms. Currie later moved Mr. Mangan from Ms. Jennings' supervision and made him her personal assistant.

22.     Ms. Jennings felt incredibly uncomfortable that Ms. Currie would choose to describe her colleagues in this manner – especially since Ms. Currie only described the Black paralegals and legal support staff in a derogatory manner.

23.     During the same conversation, Ms. Currie also informed Ms. Jennings of a rumor that the general counsel and her direct supervisor, Mr. Neal – who is also African-American – engaged in unprofessional sexual behavior with a former deputy clerk of the court, who is also African-American. Ms. Currie continued on to describe the woman involved as "fast," "sneaky," and "full of attitude," all of which are derogatory descriptors for Black women. Ms. Currie used these terms to imply that the deputy clerk of the court did, in fact, have a sexual relationship with Mr. Neal.[2]

_____

[2] OAH conducted an internal investigation concluded that these allegations were unfounded. Notwithstanding the legitimacy of this information, Ms. Currie's reporting on the rumors were still unwanted, unsolicited, and offensive.

Jennings v. DC Government
Complaint for Damages

24.     Ms. Currie continued on to express her disappointment with the clerk by relying on racist stereotypes about African-American people. Ms. Currie claimed that the clerk was "actually one of the smart ones" and "had potential." Ms. Currie further claimed that she liked that the clerk did what she was asked without "a bunch of questions" and that she was not "lazy" like the others.

25.     Ms. Jennings was appalled and offended by the characterizations of her co-workers.

26.     At the end of the meeting, Ms. Jennings told Ms. Currie that she did not like the nature of the conversation and would prefer to stick to work-related matters.

27.     During that initial meeting, Ms. Currie also stated to Ms. Jennings, "you are so articulate and well-spoken during our zoom meeting." When Ms. Jennings asked her to explain what she meant, she just said repeated the comment.

28.     Both "articulate" and "well spoken" are well known "microaggressions," frequently used to imply that Black people are neither, so the recipient of the comment must be an outlier.

Jennings v. DC Government
Complaint for Damages

29.     Ms. Jennings made it very clear to Ms. Currie that she was uncomfortable with her comments.[3]

30.     Ms. Jennings informed her direct supervisor, Mr. Neal, through email, about Ms. Currie's comments about the Black staff members, to which Mr. Neal expressed his disappointment and apologized on her behalf. Ms. Jennings also immediately reported the matter to Mia Brown, OAH's Human Representative.

### MS. CURRIE CREATED AN INTIMIDATING AND HOSTILE ENVIRONMENT FOR MS. JENNINGS.

31.     After Ms. Jennings opposed Ms. Currie's race and gender-based insults, Ms. Currie began creating a hostile work environment. Ms. Currie would leave Ms. Jennings off of emails and work assignments. Ms. Currie would also speak to Ms. Jennings less, perpetually gave Ms. Jennings a negative attitude, failed to acknowledge Ms. Jennings or even speak to her in meetings with other managers and/or OAH employees.

32.     Consequently, Ms. Jennings felt isolated and excluded at work. Ms. Jennings attempted to improve their relationship by bringing donuts to work and being friendly with Ms. Currie to no avail.

---

[3] Ms. Jennings did not follow up with an email to Ms. Currie regarding the matter because she feared reprisal. Additionally, Ms. Currie had demonstrated a penchant for degrading employees, and Ms. Jennings feared being similarly demeaned as her colleagues.

Jennings v. DC Government
Complaint for Damages

***Currie Accused Ms. Jennings of an Agency-Wide Salary Reorganizations, Excoriated her Before her Supervisor and Cut her Communication with the Chief Operating Officer.***

33.     In or around July 2021, two paralegals resigned, which prompted Mr. Neal to request that Ms. Jennings work on the team to recruit their replacements.

34.     Ms. Jennings quickly found difficulty in recruiting competent candidates, due to the low proposed starting salary. Consequently, Ms. Jennings asked OAH's Chief Operating Officer if there was room to increase the starting salaries to attract candidates. The COO informed Ms. Jennings that salary increases would have to be approved by Ms. Currie. Since Ms. Currie was not speaking to Ms. Jennings, Ms. Jennings asked Louis Neal to discuss the matter with Currie and the COO.

35.     When Ms. Currie was informed that Ms. Jennings inquired about a higher starting salary for paralegals, Currie castigated Jennings for, what Currie inaccurately considered, asking the COO to conduct an agency-wide salary reorganization.

36.     Ms. Jennings promptly corrected Ms. Currie's assessment via email. Mr. Neal also met with Ms. Currie to inform her of the actual nature of the conversation and that he instructed Ms. Jennings to pursue the recruitment and ask about the starting salary increase.

37.     Notwithstanding these corrections, Ms. Currie summoned both Mr. Neal and Ms. Jennings to a meeting to address the agency-wide "reorganization" and recruitment efforts. Ms. Currie, in a deeply aggressive and demeaning tone, yelled at Ms. Jennings and stated, "I am the

Jennings v. DC Government
Complaint for Damages

boss of this office, and you don't get to ask questions or inform anyone, including Angela, about anything." Ms. Currie also told Ms. Jennings, "know your place." Ms. Currie was so upset she began crying and told Ms. Jennings that she was "trying to take over." Ms. Currie continued to condescendingly yell at Ms. Jennings about her status as Chief Administrative Law Judge.

38.    Ms. Currie was not interested in any rebuttal or correction to her assumptions during this meeting. Ms. Currie spent the duration of the meeting speaking in an aggressive and demeaning tone, which she never used against similarly situated white employees. Ms. Currie ignored Mr. Neal's attempts to intervene while she berated Ms. Jennings. Ms. Currie repeatedly aggressively repeated "Do you understand me, Terrica!" Instead of communicating any grievance she had respectfully, as she has done with similarly situated non-Black employees, Ms. Currie used this moment to belittle and humiliate Ms. Jennings for something that was demonstrably false.

39.    Ms. Jennings believes that Ms. Currie was still angry because Ms. Jennings told her that she was not interested in her disparaging remarks about other Black employees and because she had reported the comments to Ms. Neal and Ms. Brown.

40.    After this meeting, Mr. Neal provided Ms. Currie of email exchanges between the COO and Ms. Jennings, confirming the nature of their conversation. Consequently, Ms. Currie instructed Angela Harley, COO, not to speak with Ms. Jennings about any work-related matters. Ms. Harley was also instructed not to give Ms. Jennings a copy of the key to the storage closet,

Jennings v. DC Government
Complaint for Damages

even though all other managers had access to the closet, so that they could retrieve supplies for their assigned staff.

41.     Ms. Currie informed Mr. Neal of this decision to prohibit communication between the COO and Ms. Jennings. Currie stipulated that all communication between the COO and Ms. Jennings would have to go through Mr. Neal as a liaison.

42.     Ms. Jennings continued to feel isolated from others at the agency, intimidated and humiliated.

43.     No other similarly situated non-Black or non-woman supervisor was either degraded in the ways that Ms. Currie degraded Ms. Jennings or precluded from speaking to a high-ranking official within the agency.

44.     Certainly, to the best of Ms. Jennings' knowledge, no other person who did not opposed or reported race and gender based derogatory comments were subjected to such treatment.

45.     Ms. Currie would ignore Ms. Jennings or dismiss her contributions in work meetings, often skipping over her when each manager gave their monthly reports.

46.     Ms. Currie's humiliating and hostile conduct toward Ms. Jennings exacerbated her medically diagnosed anxiety because she did not know whether Ms. Currie would eventually find a way to terminate her employment or take other adverse action against her. Ms. Currie's conduct negatively impacted Ms. Jennings's self-esteem and confidence. Because Ms. Jennings

Jennings v. DC Government
Complaint for Damages

spent so much energy attempting to get Ms. Currie to treat her with respect, this conduct

impacted her workplace morale. Ms. Jennings eventually took medical leave because of the

health effects she experienced due to Ms. Currie's pervasively degrading treatment of her.

## MS. CURRIE REASSIGNED HUMAN RESOURCE DUTIES AND OPERATIONAL DUTIES TO MS. JENNINGS WITHOUT ADDITIONAL COMPENSATION.

47.    In the late summer of 2021, Mia Brown, OAH's human resources representative

resigned.

48.    Thereafter, Ms. Currie told Mr. Neal to assign Ms. Jennings human resources-

related (HR) duties. These additional duties would be without additional compensation.

49.    Ms. Currie also assigned Ms. Jennings duties that fell under the Operational

Department, after the COO left the agency. Again, Ms. Jennings was not compensated for

additional duties.

***Currie Berated Ms. Jennings for Speaking to Newly-Hired Human Resources Officer.***

50.    Ms. Jennings completed her newly assigned HR duties in conjunction with her

regular duties as Deputy General Counsel for several months. This practice continued even after

OAH hired a new human resources representative in December of 2021.

Jennings v. DC Government
Complaint for Damages

51.     In December of 2021, Ms. Jennings asked the newly hired HR representative to attend an upcoming DC Office of Human Resource Sexual Harassment Officer training with her, since that role would be eventually reassigned to the HR department.

52.     When Ms. Currie discovered this request, she immediately became upset and instructed the new HR Representative not to attend the training with Ms. Jennings. Ms. Currie confronted Ms. Jennings about the request and berated her for speaking to her staff member. Ms. Currie yelled at Ms. Jennings and told her not to speak to the HR Representative or reassign any of the HR responsibilities that were assigned to her.

53.     Subsequently, Mr. Neal attempted explained to Ms. Currie via email that Ms. Jennings wanted the HR representative to attend the training for informational purposes and not to designate her as the agency's official Sexual Harassment Officer.

54.     Ms. Jennings emailed Ms. Neal about the incident in which Ms. Currie accosted her for speaking to the new HR Representative who was under Ms. Currie's supervision. Mr. Neal then followed up with an email to Ms. Jennings regarding Ms. Currie's conduct. In the email, he wrote the following:

> "I know. So, I'm going to have a long chat with Colleen about that. I'm truly sorry about this. I try to nurture a less "hostile" environment here. But clearly, this is a personality issue that beyond all of us. Try not to let this interfere with your time off okay? I'll handle it."

Jennings v. DC Government
Complaint for Damages

**MS. CURRIE DENIED MS. JENNINGS ADDITIONAL COMPENSATION FOR**

**ADDITIONAL DUTIES, WHILE INSISTING ON ADDITIONAL COMPENSATION**

**FOR WHITE MALE COLLEAGUE.**

55.     On or about August 31, 2021, Ms. Jennings received an annual employee evaluation, with an overall rating of "outstanding," the highest rating possible in such an evaluation. The employee evaluation also provides that "there are no deficiencies that require corrections."

56.     Around November 4, 2021, Mr. Neal communicated to Ms. Jennings that he had requested additional compensation for her due to the increased responsibilities imposed by Ms. Currie. Ms. Jennings was still managing various HR functions that had not yet been transferred to the HR department, as well as operational responsibilities, given that the COO position remained vacant.

57.     Mr. Neal also informed Ms. Currie that Ms. Jennings' salary was the same as a white, male senior attorney, who reported to Ms. Jennings, with no supervisory role or similar responsibilities to Ms. Jennings.

58.     Ms. Neal also tasked Ms. Jennings with researching the salaries of all deputy general counsels employed by the DC Government. Ms. Jennings conducted this research and found that her compensation ranked among the lowest among deputy general counsels in the DC government, particularly given her supervisory role and the additional job functions she was assigned.

Jennings v. DC Government
Complaint for Damages

59.     Though this information was shared with Ms. Currie, she refused to approve any salary increase, citing, a lack of funding.

60.     Ms. Currie later informed the management team that Mr. Mangan, her assistant, was taking on additional duties. Namely, Mr. Mangan would train new staff on how to use the agency's case management platform, a function he performed before his promotion, while under Ms. Jennings' supervision. Ms. Currie also stated that Mr. Mangan would be assisting with the website redesign project- along with a team of agency-wide staff, which included Ms. Jennings.

61.     Though Ms. Currie denied Ms. Jennings' salary increase for lack of sufficient funds, she insisted on giving a salary increase to Mr. Mangan, which Mr. Neal warned her, via email, could raise concerns about discriminatory conduct.

**MS. CURRIE CONTINUED THE HOSTILE WORK ENVIRONMENT.**

62.     During the time of the salary increase request, Ms. Currie would only speak with Ms. Jennings sparingly, regarding very few work-related matters.

63.     However, after Ms. Jennings discovered that Ms. Currie disclosed private details regarding another employee's employment status, to a subordinate employee, she reported it to Mr. Neal. Based on the private nature of the information Ms. Currie disclosed, and the potential legal ramifications, Ms. Neal met with Ms. Currie to discuss the disclosure. Following this report, Ms. Currie stopped talking to Ms. Jennings altogether, on or around mid-December 2021.

Jennings v. DC Government
Complaint for Damages

64.     When Ms. Jennings would speak to Ms. Currie in the hallways, Ms. Currie would ignore her. When Ms. Jennings would speak at meetings, Ms. Currie would ignore her contributions. Ms. Currie frequently waited days, and sometimes weeks, to respond to Ms. Jennings' work-related emails. Often, she did not respond at all.

65.     Thereafter, Ms. Currie reduced Ms. Jennings' involvement in previously assigned work projects, assignments, and meetings, including senior management meetings. Ms. Currie intentionally excluded Ms. Jennings from these work-related functions.

66.     Ms. Jennings would frequently not be invited to work-related meetings.

67.     Ms. Jennings would find out about meetings from another manager.

68.     Mr. Neal also confirmed with Ms. Jennings that Ms. Currie would conduct manager meetings without her.

69.     The Clerk of Court noticed that Ms. Jennings no longer attended the manager meetings and that she was not on the emailed invites from Ms. Currie. This manager brought it to Ms. Jennings' attention.

70.     As the chief administrative law judge, Ms. Currie is expected to work with, and rely on, Ms. Jennings' contributions as deputy general counsel. However, because Ms. Currie consistently excluded Ms. Jennings from her work functions, Ms. Jennings felt deeply anxious about her working around Ms. Currie and the security of her job. Ms. Jennings no longer felt it was productive to reach out to Ms. Currie. Ms. Jennings did not feel safe, supported, or

Jennings v. DC Government
Complaint for Damages

comfortable with reaching out to Ms. Currie. As a result, Ms. Jennings was diagnosed with depression between late December 2021 and early January 2022.

71.    Ms. Jennings discussed her mental and emotional health concerns with Mr. Neal, who encouraged her to take additional time off, because he was unable to fix the situation with Ms. Currie.

72.    Ms. Currie's poor treatment of Ms. Jennings continued for several months. When Mr. Neal would discuss her treatment of Ms. Jennings with her, Ms. Currie would respond that if she did not want to be there, she could just quit.

73.    When Ms. Jennings asked Ms. Currie why she was creating such a hostile work environment, making it difficult to do her job, Currie responded that if Jennings did not want to be there, she could quit. Ms. Currie did not address Ms. Jennings' concerns about how she was being treated by her.

74.    During this time, Ms. Currie would continue to make derogatory remarks about Black colleagues. During a meeting with a Black judge and Ms. Jennings filling in for Mr. Neal, Ms. Currie claimed that the Black judge was "not the sharpest person," and "I don't think she's writing these orders on her own," echoing common stereotypes that Black people are intellectually inferior.

75.    Mr. Neal asked Ms. Jennings to replace him on an interview panel for another HR role. Following the interview, Ms. Currie stated that the young, African-American female

Jennings v. DC Government
Complaint for Damages

candidate with several years of DC government experience, and multiple advanced HR degrees and certifications, was "too assertive," "hard to control," and "might have to be reeled in every now and then." The panel voted to hire the young woman, and a few days later, Ms. Currie told HR to rescind the offer.

## MS. CURRIE MADE DISPARAGING COMMENTS TO THE MAYOR'S OFFICE OF LEGAL COUNSEL

76.     Between March and August 2022, Ms. Currie made false representations to Ms. Jennings colleagues and specifically to HR, and the Mayor's Office or Legal Counsel.

77.     On or about February 28, 2022, an employee met with Ms. Jennings concerning a reasonable accommodations request and a COVID-19 vaccine exemption. Ms. Jennings apprised this employee of her disability coverage, while also referring the employee to DCHR for inquiries regarding vaccine exemptions.

78.     When Ms. Currie discovered the meeting, she immediately assumed that Ms. Jennings met with the employee solely to discuss vaccine exemptions, a DCHR function. Consequently, Ms. Currie summoned Ms. Jennings to a Microsoft Teams calls, where she yelled and accused Ms. Jennings of trying to process the vaccination exemption without authority and dismissed any attempt Ms. Jennings made to correct her assumptions.

Jennings v. DC Government
Complaint for Damages

79.    Ms. Currie then contacted the Mayor's Office of Legal Counsel (MOLC) to inform them that Ms. Jennings did not know how to handle vaccine mandate cases and that she attempted to process them on her own.

80.    Though this information was false, Ms. Jennings felt embarrassed that Ms. Currie would represent her like this to colleagues across agencies, especially among fellow lawyers in the DC government.

81.    In March 2022, Vanessa Natale, the Deputy Director of MOLC, arranged a meeting with Ms. Jennings to investigate third-party reports regarding Ms. Currie's behavior. Ms. Jennings attended the meeting and met with Ms. Natale and Mr. Eugene Adams, the Director of the MOLC (formerly the Executive Director of OAH and Ms. Currie's former supervisor). During the meeting, Ms. Jennings conveyed her concerns about Ms. Currie's discriminatory and racist behavior, particularly in her interactions with African-American/Black employees, especially Black women. Ms. Jennings also shared her own encounters with Ms. Currie and her observations that Ms. Currie demonstrated a lack of respect when communicating with Black employees.

82.    To the best of Ms. Jennings' knowledge, MOLC did not follow up with any action. The MOLC did not initiate an investigation into the complains Ms. Jennings provided, regarding the discriminatory conduct and the hostile work environment she was enduring.

83.    After Ms. Currie's hostile behavior continued, Ms. Jennings requested, and was granted by Mr. Neal, another medical leave of absence from April 11, 2022, to May 2, 2022.

Jennings v. DC Government
Complaint for Damages

84.     On or about June 9, 2022, Ms. Jennings requested and received permission from Mr. Neal to apply for the nationally accredited Certified Manager program at George Washington University. Ms. Jennings sent her request to the HR representative the next day, who then consulted with Ms. Currie. Ms. Currie denied the enrollment in the program, citing that the agency did not have training funds available in the budget to cover the cost and she needed the funds for the Judges. At this point, most employees, including the Judges were still teleworking and very few people requested to attend any form of training to deplete the agency's budget.

**MS. JENNINGS STEPS IN AS INTERIM GENERAL COUNSEL WITHOUT ADDITIONAL COMPENSATION**

85.     In the summer of 2022, Mr. Neal departed from OAH, leaving the role of general counsel vacant.

86.     In July 2022, after Mr. Neals's sudden departure from OAH, Ms. Jennings requested a meeting with Mr. Adams and Ms. Natale, at the MOLC, which handles interagency legal issues and personnel matters for legal staff. Ms. Jennings again reported the hostile work environment, discrimination, and retaliation she was dealing with while working for Ms. Currie. Mr. Adams suggested the situation might improve with Mr. Neals's departure and hinted at a potential interim general counsel role for Ms. Jennings. Nonetheless, Ms. Jennings' complaints were ignored, and despite a follow-up email to Ms. Adams regarding the same issues, no investigation ensued.

Jennings v. DC Government
Complaint for Damages

87.    On or about August 1, 2022, Ms. Currie asked Ms. Jennings to serve as interim general counsel until she could hire a replacement. During this meeting, Ms. Currie continued to be abrasive and dismissive to Ms. Jennings. Ms. Currie told Ms. Jennings that the interim position would be purely a title, with no actual authority, and that all legal department matters would require her approval.

87. 88.  When Ms. Jennings inquired about a salary adjustment during the interim period, Ms. Currie responded with a blunt "nope!" Ms. Jennings then pointed out that in the District government, interim staff typically received the same pay as their predecessors, especially considering she was still responsible for various HR and operational functions. Ms. Currie's response was to tell her she could quit if she didn't like it.

88.    On or about August 1, 2022, Ms. Currie asked Ms. Jennings to serve as interim general counsel until she could hire a replacement. During this meeting, Ms. Currie continued to be abrasive and dismissive to Ms. Jennings. Ms. Currie told Ms. Jennings that the interim position would be purely a title, with no actual authority, and that all legal department matters would require her approval. When Ms. Jennings inquired about a salary adjustment during the interim period, Ms. Currie responded with a blunt "nope!" Ms. Jennings then pointed out that in the District government, interim staff typically received the same pay as their predecessors, especially considering she was still responsible for various HR and operational functions.

Page 24 of 33

Jennings v. DC Government
Complaint for Damages

89.     Again, Ms. Currie informed Ms. Jennings that if she did not want the position without extra compensation, that she can decline it and quit her job.[4]

90.     On August 2, 2022, the following day, Ms. Jennings sent an email to Ms. Currie in which she officially declined the interim general counsel position but expressed her desire to remain in her current role as deputy general counsel.

91.     On August 3, 2022, Ms. Jennings again contacted MOLC via email to request an investigation into Ms. Currie's hostile work environment.

92.     On August 5, 2022, MOLC placed Ms. Jennings on administrative leave, without explanation.

93.     The investigation was assigned to DC's Department of Forensic Sciences, who ultimately did not substantiate any instance of discrimination, hostile work environment, or retaliation. As a result, Ms. Jennings was scheduled to return from her administrative leave on March 1, 2023.

94.     Because Ms. Currie's conduct was so hostile that it exacerbated Ms. Jennings' health despite Ms. Jennings' many attempts to promote a respectful work environment, Ms. Jennings could not reasonably work continue her employment under Ms. Currie. On February 28, 2023, Ms. Jennings resigned from her position as Deputy General Counsel.

---

[4] When Mr. Neal occupied the position, he made approximately $30,000 more than Ms. Jennings salary at that time.

Page 25 of 33

Jennings v. DC Government
Complaint for Damages

**COUNT I HOSTILE WORK ENVIRONMENT/~~SEXUAL HARASSMENT~~— Title VII of the 1964 Civil Rights Act.**

95.   Plaintiff repeats and re-alleges each and every allegation contained in paragraph 1 through 94 and incorporates them by reference as if fully set out herein.

96.   To establish a prima facie Title VII hostile work environment claim, the Plaintiff must show: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her protected status; and (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment. *See Davis v. Coastal Int'l Sec., Inc.,* 275 F.3d 1119, 1122–23 (D.C.Cir.2002); *Curry v. District of Columbia,* 195 F.3d 654, 660 (D.C.Cir.1999).~~For a prima facie case for sexual harassment, a plaintiff must show that "(1) that she is a member of a protected class, (2) that she was subject to unwelcome harassment, (3) that the harassment occurred because of her race or gender, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent it." *Tolson v. Springer*, 618 F. Supp. 2d 14, 20 (D.D.C. 2009),~~

97.   As a Black woman, both Ms. Jennings' race and gender are protected classes.

98.   Ms. Jennings was subjected to unwelcome sexually degrading, racially derogatory, and dismissive remarks about herself and other Black women in the office and in other agencies at the D.C. government by her supervisor and agency director, Chief Judge Margaret Colleen Currie. For instance, Ms. Currie derided Ms. Jennings' Black and Black women colleagues for wearing short skirts while "bending over and showing her ass"; referred to

Jennings v. DC Government
Complaint for Damages

several administrative judges as "dumb" and "unintelligent"; complained that a coworker with an amputated leg took too much time off work because of his leg; and speculated about a coworker's sex life.

99.    These comments were based on her and the other Black women's membership as a protected class. Ms. Currie did not make these remarks or performed this treatment on any non-Black and non-woman employee.

100.    After Ms. Jennings opposed these sexually degrading, racist, and offensive comments, Ms. Currie initiated a series of hostile and retaliatory actions. These actions included ceasing communication with Ms. Jennings; isolating her from colleagues by instructing them not to speak with her; unjustly accusing her of insubordination despite corrections from colleagues; withholding training opportunities; reallocating her job responsibilities; failing to provide fair compensation commensurate with similarly situated deputy general counsels across the DC government; and offering her an interim General Counsel position without equal pay to the previous male General Counsel. Additionally, Ms. Currie conveyed that the General Counsel role would be a title-only position with no real authority, which departs from the conditions under the previous male who occupied the role.

99.101.    This conduct arose from Ms. Currie's initial in-office conversation with Ms. Jennings, when Ms. Currie expressed her disdain toward Black and Black women employees.

100.102.    This harassment was continuous and ongoing throughout the entirety of Ms. Jennings' employment with OAH.

Jennings v. DC Government
Complaint for Damages

103.    The harassment was performed by Ms. Jennings' superior, Chief Judge Margaret Colleen Currie.

104.    Ms. Jennings eventually took medical leave because of the health effects she experienced due to Ms. Currie's pervasively degrading treatment of her.

101.105.    Ms. Currie's conduct necessarily affected Ms. Jennings work because Ms. Jennings was isolated from her team, and prevented from participation in meetings and emails – as her position required. Ms. Currie's reassignment of duties also interrupted Ms. Jennings' work responsibilities and supervision over her subordinates.

102.106.    As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, and mental anguish.

**COUNT II HOSTILE WORK ENVIRONMENT/SEXUAL HARASSMENT – DC Human Rights Act.**

103.107.    Plaintiff repeats and re-alleges each and every allegation contained in paragraph 1 through 1062 and incorporates them by reference as if fully set out herein.

104.108.    The newly amended D.C. Human Rights Act provides, in relevant part, that:

(A) Harassment" means conduct, whether direct or indirect, verbal or nonverbal, that unreasonably alters an individual's terms, conditions, or privileges of employment or has the purpose or effect of creating an intimidating, hostile, or offensive work environment.

(B) "Sexual harassment" means:
(i) Any conduct of a sexual nature that constitutes harassment as defined in subparagraph (A) of this paragraph; and
(ii) Sexual advances, requests for sexual favors, or other conduct of a sexual nature where submission to the conduct is made either explicitly or implicitly a term or condition of employment or where submission to or rejection of the conduct is used as the basis for an employment decision affecting the individual's employment.

Page 28 of 33
Jennings v. DC Government
Complaint for Damages

D.C. Code Ann. § 2-1402.11 (c-2)(2)(A) (West).

109.    Moreover, the statute requires a hostile work environment to be analyzed under a "totality of circumstances" model. The statute states, in relevant part, that:

In determining whether conduct constitutes unlawful harassment under this subsection, a finder of fact shall consider the totality of the circumstances and view conduct based on multiple protected characteristics in totality, rather than in isolation. Conduct need not be severe or pervasive to constitute harassment and no specific number of incidents or specific level of egregiousness is required.

D.C. Code Ann. § 2-1402.11 (c-2)(3)

105.110.    The Defendant's conduct, as described in Counts I, became so frequent that it was a condition of Ms. Jennings' continued employment. Ms. Currie's conduct has even affected Ms. Jennings' ability to be compensated similarly with her peers or be compensated for the promoted position of general counsel.

106.111.    As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, pain and suffering, and mental anguish.

**COUNT III RETALIATION – 1964 Civil Rights Act.**

107.112.    Plaintiff repeats and re-alleges each and every allegation contained in paragraph 1 through 110106 and incorporates them by reference as if fully set out herein.

113.    When Ms. Jennings complained about Ms. Currie's conduct, Ms. Currie created a hostile work environment with the conduct as described in Count I and Count II.

108.114.    When Ms. Jennings complained about Ms. Currie's conduct to the Mayor's Office of Legal Counsel, she was immediately placed on administrative leave. This action removed her from her professional role and barred her from engaging in leadership

Jennings v. DC Government
Complaint for Damages

activities, participating in learning programs, and pursuing opportunities for professional

advancement for six months. This suspension significantly affected her well-being, career

trajectory and professional development within OAH and District Government as a whole.

109.115.    Ms. Currie also reassigned Ms. Jennings HR duties and operational duties

because Ms. Jennings complained about and opposed her hostile work environment.

110.116.    As a result, plaintiff has suffered and is suffering considerable injuries,

including emotional distress, mental anguish, loss of enjoyment of life, and reputational harm.

**COUNT IV RETALIATION – DC Human Rights Act.**

111.117.    Plaintiff repeats and re-alleges each and every allegation contained in

paragraph 1 through 11609 and incorporates them by reference as if fully set out herein.

112.118.    When Ms. Jennings complained about Ms. Currie's conduct, she was

placed on administrative leave, deprived of leadership, learning, and professional growth

opportunities for six months.

119.    Ms. Currie also created the aforementioned hostile work environment, and

reassigned Ms. Jennings HR duties and operational duties because Ms. Jennings complained

about and opposed her hostile work environment.

113.120.    Additionally, Ms. Currie assigned Ms. Jennings interim general counsel

workload and responsibilities after the general counsel departed the agency. Ms. Currie refused

to provide any additional salary for this increased role and responsibilities. Ms. Currie then asked

Ms. Jennings to formally become the interim general counsel. When Ms. Jennings asked for

compensation for this title, Ms. Currie declined.

Jennings v. DC Government
Complaint for Damages

114.121.     As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, mental anguish, loss of enjoyment of life, and reputational harm.

**COUNT V UNEQUAL PAY**

**~~DISCRIMINATION~~ Title VII of the 1964 Civil Rights Act;**

**~~DISCRIMINATION~~ DC Human Rights~~sue~~ Act**

115.122.     Plaintiff repeats and re-alleges each and every allegation contained in paragraph 1 through 121~~14~~ and incorporates them by reference as if fully set out herein.

123.   Ms. Jennings was compensated less than similarly situated deputy general counsels in the DC government who were not Black women.

116.124.     On multiple occasions, either Ms. Jennings requested a raise from Ms. Currie, or Mr. Neal requested a raise on Ms. Jennings' behalf from Ms. Currie. Ms. Currie refused to provide a raise to Ms. Jennings, citing budgetary restrictions. However, within the same budgetary year, Ms. Currie insisted on a raise for her Caucasian assistant, whom she removed from Ms. Jennings' supervision.

117.   As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, mental anguish, loss of enjoyment of life, reputational harm, loss of self-esteem, loss of income, loss of quality of life, loss of future income, and embarrassment.

125.

**COUNT VI UNEQUAL PAY**

**Title VII of the 1964 Civil Rights Act;**

**DC Human Rights Act**

Page 31 of 33

Jennings v. DC Government
Complaint for Damages

126.    Plaintiff repeats and re-alleges each and every allegation contained in paragraph 1 through 125 and incorporates them by reference as if fully set out herein.

127.    Ms. Currie sought for Ms. Jennings to assume the role of interim attorney general while assuming duties of human resources.

128.    Although Ms. Jennings would assume the role of General Counsel after the departure of Mr. Neal, a similarly situated man, Ms. Jennings was not provided compensation for the additional duties in any way.

129.    Further, Mr. Neal did not carry any human resources duties, for which Ms. Jennings was responsible after her reassignment of duties.

130.    When Ms. Jennings brought raised this issue to Ms. Currie, Currie refused to compensate her.

131.    As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, mental anguish, loss of enjoyment of life, reputational harm, loss of self-esteem,  loss of income, loss of quality of life, loss of future income, and embarrassment,

**Formatiert:** Listenabsatz, Links, Mit Gliederung + Ebene: 1 + Nummerierungsformatvorlage: 1, 2, 3, … + Beginnen bei: 1 + Ausrichtung: Links + Ausgerichtet an: 1,27 cm + Einzug bei:  0 cm

**hat formatiert:** Schriftart:

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment against the Defendant and prays for the following relief:

A.    Issue a declaratory judgment that Defendants' conduct as complained herein violated Plaintiff's federal civil rights and rights under Washington DC law;

B.    Award reasonable and appropriate compensatory damages to Plaintiff, in an amount to be ascertained at trial, for emotional distress, embarrassment, anxiety, humiliation,

Jennings v. DC Government
Complaint for Damages

exclusion, inconvenience, and loss of income, from which Ms. Jennings continues to suffer by

Defendants' unlawful conduct described above;

      C.     Award exemplary and punitive damages to Plaintiff, in an amount to be ascertained

at trial, to deter similar unlawful acts in the future;

      D.     Award Plaintiff's costs, expenses, and reasonable attorneys' fees;

      E.     Award such other and further relief as this Court deems necessary and proper.

                    Respectfully Submitted,

                    _____

                    Robert Baldwin III, Esq. (Bar No. 90002020)
                    Virtue Law
                    1250 Connecticut Ave, Suite 700
                    Washington D.C., NW 20036
                    T: (301) 821-6407
                    Robert@virtuelawgroup.com
                    *Counsel for Plaintiff*

Jennings v. DC Government
Complaint for Damages