# __Unreported Authorities__

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| CHARLES E. DIGGS II, | * | |
| | * | 2023-CAB-004848 |
| Petitioner, | * | |
| | * | Judge Danya A. Dayson |
| v. | * | |
| | * | |
| D.C. OFFICE OF HUMAN RESOURCES, | * | |
| | * | |
| Respondent. | * | |

## ORDER DENYING MOTION FOR JUDICIAL REVIEW

Before the Court is Petitioner Charles E. Diggs II's Motion for Judicial Review filed July 1, 2024. Intervenor Cesar Chavez Public Charter School filed its Brief in Opposition on August 12, 2024. Respondent D.C. Office of Human Rights ("OHR") filed its Brief in Opposition on August 26, 2024. Petitioner filed timely Replies. Upon consideration of the Motion, the Briefs in Opposition, the Replies, the entire record herein and for the reasons stated herein, the Motion is denied and the Petition is dismissed.

## BACKGROUND

This matter arises out of Petitioner Charles E. Diggs II's Petition for Review of Agency Order, filed August 7, 2023. On August 10, 2015, Cesar Chavez Public Charter School ("Cesar Chavez") hired Petitioner as a high school music teacher at its Capitol Hill campus. *See* OHR Br. in Opp'n at 3 (citing R. at 697). On May 24, 2018, Cesar Chavez declined to renew Petitioner's employment contract, citing budget concerns associated with student enrollment at the Capitol Hill campus. *See id.* (citing R. at 692–96).

On December 20, 2022, the District of Columbia Office of Human Rights ("OHR") issued an initial Letter of Determination finding no probable cause to support Petitioner's complaints of (1) retaliation and (2) disparate treatment based on sexual orientation, sex or

1

disability. *See* Letter of Determination ("Initial LOD") at 1 (Dec. 20, 2022). Petitioner submitted a request for reconsideration of the initial LOD on December 21, 2022, which was denied by OHR on November 27, 2023. *See* R. at 2; OHR Br. in Opp'n 1 n.1. On February 16, 2024, the parties appeared for a status conference and at that time, OHR voluntarily requested a remand of its initial LOD and November 27, 2023 Order denying reconsideration because it had failed to consider a "small number of documents supplied by Petitioner . . . during its initial investigation were not included in the voluminous record and therefore not initially considered." OHR Br. in Opp'n 1 n.1 (citing Ord. on Pet.'s Mot. to Compel (Feb. 20, 2024) (J. Dayson)). Thereafter, on May 14, 2024, OHR issued its Supplemental LOD, which found "found No Probable Cause to believe that Petitioner was subjected to: 1) retaliation for engaging in protected activity under the D.C. Human Rights Act (DCHRA); or 2) disparate treatment based on his sexual orientation, sex, or disability." OHR Br. in Opp'n 1.

In the instant Motion for Judicial Review filed July 1, 2024, Petitioner seeks review of the Supplemental LOD and its determination of No Probable Cause to support an action of retaliation or disparate treatment. Specifically, Petitioner has alleged that: (1) Cesar Chavez Public Charter School ("Cesar Chavez") had retaliated against him after he engaged in protected activities by (a) providing negative performance ratings, (b) failing to renew the petitioner's employment, and (c) giving the petitioner a negative employment reference; (2) Cesar Chavez subjected him to disparate treatment when the school failed to renew his employment; and (3) OHR failed to investigate Petitioner's hostile work environment claim. *See* Pet.'s Mot. 1; Suppl. LOD 1–2.

Cesar Chavez filed its Brief in Opposition on August 12, 2024, to which Petitioner replied on August 13, 2024. OHR filed its Brief in Opposition on August 26, 2024, to which

Petitioner replied on August 27, 2024.

## LEGAL STANDARD: JUDICIAL REVIEW

In reviewing an agency's decision, the court "must examine the agency record to determine whether there is substantial evidence to support the agency's findings of fact and whether the agency's action was arbitrary, capricious, or an abuse of discretion." *D.C. Off. of Hum. Rts. v. D.C. Dep't of Corr.*, 40 A.3d 917, 923 (D.C. 2012) (internal quotations and citations omitted); *Vogel v. D.C. Off. of Planning*, 944 A.2d 456, 462 n.10 (D.C. 2008) (noting that Superior Court is the "proper forum for initial review of OHR decisions" and that "judicial review is limited to the administrative record, and the court must affirm the agency action if it is supported by substantial evidence and otherwise in accordance with law"). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Wash. Metro. Area Transit Auth. v. D.C. Dep't of Emp't Servs.*, 827 A.2d 35, 39 (D.C. 2003) (citation and internal quotation marks omitted); *Vogel*, 944 A.2d at 463–64 (articulating the substantial evidence standard as "a well-worn phrasing that is deferential to the administrative agency's prerogatives as trier of fact but not toothless in its insistence on evidence with genuine probative force."). If, however, an agency decision "ignores material evidence in the record," the agency "fails to base its decision on substantial evidence in the record." *Darden v. D.C. Dep't of Emp't Servs.*, 911 A.2d 410, 416 (D.C. 2006) (citation omitted). Ultimately, when the court is determining whether an agency decision is supported by substantial evidence in the record, the court will disturb the agency's finding "only if the record compels a contrary conclusion," meaning that the finding was "contrary to the overwhelming weight of the evidence in the record as a whole." *Wash. Metro. Area Transit Auth. v. D.C. Dep't of Empl. Servs.*, 992 A.2d 1276, 1283 n.5 (D.C. 2010) (citations omitted).

## ANALYSIS

There are two issues[1] for this Court to decide on review of OHR's final decision. First, the Court must determine whether there is substantial evidence in the record to support OHR's determination of No Probable Cause to believe that Petitioner was subjected to retaliation because of Cesar Chavez's "legitimate, non-retaliatory reason for failing to renew [Petitioner's] employment (significant budget concerns associated with declining enrollment)." Intervenor's Br. 1 (citing Suppl. LOD 2). Second, whether there is substantial evidence to support OHR's determination of No Probable Cause to believe that Cesar Chavez "subjected [Petitioner] to disparate treatment on the basis of sexual orientation, sex or disability when it failed to renew his employment on May 24, 2018." *Id.*

### I.    Retaliation: Whether There is Substantial Evidence to Support Cesar Chavez's Legitimate, Non-Discriminatory Reason for Not Renewing Petitioner's Employment.

As an initial note, OHR concedes that Petitioner engaged in three protected activities: (1) the September 12, 2017 EEOC complaint; (2) the March 13, 2017 email; and (3) the March 17, 2018 OHR complaint. *See* R. at 5–6.

As noted by the Court of Appeals, in an employment discrimination case brought under the District of Columbia Human Rights Act ("DCHRA"), "OHR conducts an initial investigation

---

[1] Petitioner also argues that OHR erred when it failed to consider his hostile work environment claim. Upon review of the record, OHR did address Petitioner's hostile work environment claim in both the Initial LOD and the Supplemental LOD. *See* R. at 016–19, 787. In its initial and supplemental decisions, OHR found that the alleged misconduct was not objectively hostile nor severe or pervasive enough to affect a term, condition, or privilege of employment. *See Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887 (D.C. 2003) (listing the elements of hostile work environment). Upon review, the Court finds no basis to overturn OHR's dismissal of Petitioner's hostile work environment claim. In addition, Petitioner's Motion argues that OHR failed to apply the D.C. Human Rights Enhancement Amendment Act of 2022 to his hostile work environment claim. *See* Pet.'s Mot. 73–74. However, Petitioner fails to proffer that the amendments were meant to be retroactive to apply to conduct that allegedly occurred in 2017 and 2018. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (articulating the principle that in the absence of a clear manifestation of legislative intent, there is a general presumption against the retroactive application of new laws). Thus, the Court affirms OHR's findings on hostile work environment.

to determine whether there is probable cause to credit the complainant's allegations." *Sparrow v. D.C. Off. of Hum. Rts.*, 74 A.3d 698, 703 (D.C. 2013) (citing D.C. Mun. Reg. tit. 4, § 715.1 (2013)). "A finding of probable cause shall be based upon credible, probative, and substantial evidence which demonstrates a nexus between the harm complained of and the protected characteristic or activity of the complainant." *Id.* (citing D.C. Mun. Reg. tit. 4, § 716.1 (2013)); *cf. Ammerman v. Newman*, 384 A.2d 637, 639–40 (D.C. 1978) ("Probable cause does not mean sufficient cause. According to the generally accepted view, probable cause depends not on the actual state of the case in point of fact, but upon [facts and circumstances that warrant an] honest belief . . . . It may flow from a belief that turns out to be unfounded as long as it is not unreasonable.") (citations omitted)).

As stated hereinabove, Petitioner has alleged that: (1) Cesar Chavez Public Charter School ("Cesar Chavez") had retaliated against him after he engaged in protected activities by (a) providing negative performance ratings, (b) failing to renew the petitioner's employment, and (c) giving the petitioner a negative employment reference. *See* Pet.'s Mot. 1; Suppl. LOD 1–2. Petitioner challenges OHR's finding of No Probable Cause regarding his retaliation claim because (1) he established a prima facie case for retaliation, and (2) OHR improperly ignored evidence that can demonstrate that the proffered legitimate reasons for Cesar Chavez's actions were pretextual. *See* Pet.'s Mot. 3.

To prove a *prima facie* case of retaliation, a "plaintiff must demonstrate that: (1) he was engaged in a protected activity; (2) the employer took an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action." *Bryant v. District of Columbia*, 102 A.3d 264, 268 (D.C. 2014) (citing *Taylor v. D.C. Water & Sewer Auth.*, 957 A.2d 45, 54 (D.C. 2008)). An adverse employment action is one in which "a

reasonable employee would have found the challenged action materially adverse which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). "The burden of demonstrating that a reasonable worker might well have been dissuaded from making or supporting a charge of discrimination does not require a showing that the retaliatory conduct directly affected the terms and conditions of employment." *Sampay v. Am. Univ.*, 294 A.3d 106, 116 (D.C. 2023) (citing *Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 112 n.51 (D.C. 2018)).

"The standard of *material* adversity is meant 'to separate significant from trivial harms' and exclude 'petty slights or minor annoyances that often take place at work and that all employees experience.'" *Bereston*, 180 A.3d at 112 (emphasis in original) (quoting *Burlington N.*, 548 U.S. at 68). Thus, "[w]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Id.* (citations omitted); *see also Smith v. D.C. Off. of Hum. Rts.*, 77 A.3d 980, 993 (D.C. 2013) ("A party seeking to prove a claim of retaliation must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.").

Where, as here, the plaintiff relies on circumstantial evidence to prove retaliation, the Court applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Howard Univ. v. Green*, 651 A.2d 41, 45 n.4 (D.C. 1994) (adopting the *McDonnell Douglas* standard). Under the *McDonnell Douglas* framework as adopted by the Court of Appeals, if the plaintiff satisfies the initial burden of producing evidence to support a

prima facie case,

> The employer must then produce evidence of a legitimate, nondiscriminatory [or nonretaliatory] reason for its action. If the employer offers a legitimate, nondiscriminatory [or nonretaliatory] reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. The ultimate burden of persuasion rests with the plaintiff to show that the defendant acted with impermissible motive or intent.

*Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012) (quoting *McDonnell Douglas*, 411 U.S. at 802–04.

> A. <u>Substantial evidence supports OHR's finding that the Petitioner failed to establish a *prima facie* case for a negative performance review and "insufficient" employment reference.</u>

Upon review, OHR's findings were not contrary to the substantial weight of the evidence in the record when it found that the negative performance review was not a materially adverse action. The Court of Appeals has indicated that a negative performance evaluation need not lead to tangible harm to be actionable in a retaliation context. *Sampay v. Am. Univ.*, 294 A.3d 106, 116 (D.C. 2023) ("Although AU in its brief argues that appellant cannot demonstrate that she was harmed in any way, demonstrating harm is the requirement for a discrimination claim, not a retaliation claim. Even if AU had a lawful business reason for extending appellant's probationary period (which may contribute to a finding that the action was not pretextual), a lawful business reason does not prevent the extension of probation from constituting an adverse action."). However, as stated hereinabove, "not everything that makes an employee unhappy is an actionable adverse action." *Bereston*, 180 A.3d at 112. Thus, to be actionable, Petitioner would need to show that the negative performance review would dissuade a reasonable employee from "making or supporting a charge of discrimination." *Smith v. D.C. Off. of Hum. Rts.*, 77 A.3d 980, 993 (D.C. 2013).

Here, Petitioner failed to provide evidence of how receiving a negative performance review qualified as a material adverse employment action. The Court agrees with OHR's assessment that the Petitioner failed to provide evidence that the negative performance review "was used for any purpose other than to relay job-related observations to the petitioner," or to suggest that these observations had any adverse consequences for Petitioner. *See* OHR's Br. in Opp'n at 12. A review of the record shows that the reviews played little role in Petitioner's duties or employment status and there is no evidence in the record that shows that Cesar Chavez relied upon said reviews in its decision not to renew Petitioner's contract. *See* Suppl. LOD 27. Thus, the Court affirms OHR's finding that the negative performance reviews were not a materially adverse action.

Moreover, OHR's findings were not contrary to the substantial weight of the evidence in the record when it found that the employment reference was not a materially adverse action. For a negative job reference to constitute an adverse employment action, a plaintiff "must demonstrate (1) that disparaging comments were made; (2) the person to whom the comment was made; and (3) that the plaintiff was denied employment because of the negative job reference." *Simmons v. Cox*, 495 F. Supp. 2d 57, 66 (D.D.C. 2007); *see also Niedermeier v. Off. of Max S. Baucus*, 153 F. Supp. 23, 31 (D.D.C. 2001). Here, the record shows that that the reference did not provide negative information about Petitioner; rather Cesar Chavez provided the information that she was permitted to provide: the dates of employment, positions held, and salary information. *See* OHR Br. in Opp'n 14 (citing R. 856–57). Thus, it would be inapposite to find that the reference constituted a material adverse action.

As to Petitioner's argument that OHR failed to investigate various additional adverse actions that made up a "pattern of antagonism" that linked his protected activities to his ultimate

termination, including a 2017 Performance Improvement Plan ("PIP")[2] and that Cesar Chavez

made him work out of three different classrooms, the record shows that OHR addressed the PIP

although it was not a part of his OHR charge and determined that there were sufficient legitimate

reasons for the PIP. *See* note 2 (regarding PIP). As to Petitioner's complaint regarding working

out of multiple classrooms, the record shows that Petitioner included that allegation in his EEOC

complaint, R. at 172–73, which the EEOC considered and dismissed due to its inability to

"conclude that the information obtained establishes violations of the statutes." R. at 174.

Thus, the Court now turns to the non-renewal of employment.

B. Substantial evidence supports OHR's no probable cause finding for retaliation based on the discharge because Petitioner failed to prove that budget deficiency was a pretext.

As conceded by OHR, Petitioner "established a *prima facie* claim of reprisal with respect

to the non-renewal of his employment contract." OHR Br. in Opp'n 17. However, OHR

ultimately found that Cesar Chavez's proffered non-retaliatory reason for the non-renewal,

namely budgetary concerns and declining enrollment, was reasonably supported by the

substantial evidence in the record. *Id.* Petitioner argues that the budgetary concerns and declining

enrollment numbers at the Capitol Hill campus was pretextual. *See* Pet.'s Mot. 48, 50–56.

"Once [Petitioner] has presented a *prima facie* case of retaliation, the burden shifts to the

---

[2] For context, in January and February 2017, numerous Cesar Chavez employees submitted formal Human Resources ("HR") complaints alleging that Petitioner had subjected them to a hostile work environment based on "multiple accounts" of Petitioner improperly delegating duties, repeatedly treating employees as "incompetent," accusing them of not doing their jobs, and being "argumentative and disrespectful." R. at 747–49 (Cesar Chavez EEOC Position Statement, Ex. 2). Petitioner submitted numerous counter-complaints in turn. *See id.*; Initial LOD at 9–10. Following a five month investigation into the complaints and counter-complaints, on August 1, 2017, the Cesar Chavez Board of Trustees determined that Petitioner's claims were unsubstantiated but that some of the complaints against Petitioner were substantiated and thus placed Petitioner on a 60-day Performance Improvement Plan ("PIP"). *See* OHR Br. in Opp'n 4 (citing R. at 495–98). As noted by OHR, the PIP had nothing to do with the complained-of performance reviews and was supported by independent, legitimate reasons following a five month investigation.

employer to show a legitimate, non-retaliatory reason for the contested action." *Propp v. Counterpart Int'l*, 39 A.3d 856, 868 (D.C. 2012). At such stage, "the employer need only make a proffer; the persuasiveness of the evidence is not considered until the court needs to determine whether that reason was pretextual." *Sampay v. Am. Univ.*, 294 A.3d 106, 117–18 (D.C. 2023) (citing *Johnson v. District of Columbia*, 225 A.3d 1269, 1281-82 (D.C. 2020)).

Cesar Chavez proffered that Petitioner's employment contract was not renewed due to budgetary concerns and declining student enrollment. The record demonstrates that OHR considered the following evidence:

> Respondent alleges that it experienced a 14% reduction in student enrollment for School Year 2016-2017. Publicly available records indicate that 332 students were enrolled at the Capitol Hill campus for the 2016-2017 school year. Suppl LOD 13, ¶ 8.

> Respondent alleges that it had a 22.5% reduction in student enrollment for the 2017-2018 school year. Respondent's Annual Report for 2017-2018 School Year indicates that 259 Students were enrolled at the Capitol Hill campus specifically (down from the 332 the previous year). *Id.* at 16–17, ¶ 25.

> The Staff Roster for the 2017-2018 school year indicates that thirty-nine teachers taught at the Capitol Hill campus that year. *Id.* at 17, ¶ 26.

> Respondent alleges that it projected declining enrollment for the 2018-2019 school year and, as a result, it conducted a transcript audit in 2018. Respondent alleges that only seven students would need to take music as a graduation requirement in the 2018-2019 school year, and that the music requirement would be met via online instructions, which was more cost effective than employing a full-time teacher. CEO alleges that at the time of the audit only four students were rising seniors who needed to take music, and that even after four additional students enrolled over the summer, only eight seniors needed to take music in 2018-2019. *Id.* at 19, ¶ 37.

> On May 24, 2018 Respondent declined to renew the employment contracts of Complainant and three other employees (male, sexual orientation and disability status unknown) for the 2018-2019 academic year. Two of these employees were math teachers and one was a science teacher. *Id.* at 19, ¶ 38.

> Respondent alleges that it did not renew Complainant's contract due to budget concerns associated with declining student enrollment, which lead to a decrease in

staff. *Id.* at 19, ¶ 39.

Complainant alleges that Respondent would not have known what its 2018-2019 school enrollment number would be by May 24, 2018, and that it could not know its revenue until June 30, 2018, the end of the fiscal year. *Id.* at 20, ¶ 44.

Respondent's Tax form 990 for the fiscal year of June 2017 through June 2018, which indicates that Respondent earned less revenue that year that the previous year ($26,320,097 in FY 2017-2018 as opposed to $26,914,711 in FY 2016-2017)< but that its overall assets increased from $11,673,651 to $12,673,914. *Id.* at 20, ¶ 45.

Respondent enrolled 238 students at its Capitol Hill Campus for the 2018-2019 school year (down from 259 students the previous year). *Id.* at 20, ¶ 46.

Respondent alleges that for the 2018-2019 school year, music instruction was offered to seven students by providing a block of time during the school day, supervised by a College Counselor, during which they completed a online course to fulfill their graduation requirement. *Id.* at 21, ¶ 48.

Respondent did not hire any new music teacher at any Respondent campus for the 2018-2019 school year. Respondent retained Comparator, who had been employed with Respondent since 2014, at the Parkside campus. *Id.* at 21, ¶ 49.

Respondent's "Staff/Volunteer Roster" for the 2018-2019 school year indicates that there were thirty-seven staff at the Capitol Hill Campus (down from thirty-nine the previous year). The roster indicates that Respondent continued to employ multiple elective teachers, including male elective teachers such as an Art Teacher and a Health Teacher. The Roster does not indicate that there was a music teacher at the Capitol Hill Campus in 2018-2019. *Id.* at 21, ¶ 50.

Respondent's Annual Reports indicate that it employed 106 "teachers" at all of its campuses for the 2017-2018 school year, but that the number decreased to 100 for the 2018-2019 school year. For overall staff, Respondent employed 2019 employees for the 2017-2018 school, which decreased to 158 employees for the 2018-2019 school year. *Id.* at 21, ¶ 51.

On November 13, 2018, Respondent's Board of Trustees met and decided that, for "financial, programmatic, and operations reasons" it would consolidate its Capitol Hill campus with its Parkside High School campus for the 2020-2021 school year and close the Capitol Hill Campus. *Id.* at 22, ¶ 58.

On January 23, 2019, Respondent's Board of Trustees announced that Respondent's student enrollment had declined by approximately thirty-four percent, and that Respondent would need to "reconfigure[] for the organization to meet its financial obligations and ensure continued viability." As part of this

reconfiguration, the Board announced that it would be closing Respondent's Capitol Hill campus and eliminating all teaching and administrative positions at that campus. *Id.* at 23, ¶ 59.

At this point, the burden shifts to Petitioner to show that the proffered reason is pretextual. *See Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012) (quoting *McDonnell Douglas*, 411 U.S. at 802–04) ("If the employer offers a legitimate, nondiscriminatory [or nonretaliatory] reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. The ultimate burden of persuasion rests with the plaintiff to show that the defendant acted with impermissible motive or intent."). "Courts are not free to second-guess an employer's business judgment, and a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding an employer's articulated reasons for its decisions." *Propp*, 39 A.3d at 870 (quoting *Furline v. Morrison*, 953 A.2d 344, 354 (D.C. 2008)) (internal brackets omitted). "But employers cannot shield their adverse actions as business judgment if the record belies the proffered reason." *Id.*

Here, the record demonstrates that Cesar Chavez's Capitol Hill campus was experiencing a substantial decline in student enrollment over the two years preceding Petitioner's non-renewal, such issues were projected to continue into the 2018-2019 school year and ultimately led to the closing of the entire campus. As noted by OHR in the Supplemental LOD, Petitioner did not provide new evidence regarding pretext, but rather asserts that Cesar Chavez "decided to close its Capitol Hill campus and merge it with Parkside . . . in order to shield itself from lawsuits." Pet.'s Mot. 69. Petitioner also makes numerous references to an exchange between himself and then-Principal Sarah Lehar regarding the 2018 classroom observation where Petitioner "began to threaten legal action, repeatedly saying that 'this is going to court'" and Ms. Lehar told Petitioner that she was "uncomfortable with the direction of the conversation and

terminated it." *See* R. at 740 (Position Statement); Pet.'s Mot. 23, 27, 37, 38, 47, 49, 52, 58, 63, 77. While Petitioner argues that Cesar Chavez "by its own admission '*terminated*' its deadlines with me because it stated it was '*uncomfortable*' with me pursuing legal actions by filing Charges of Discrimination against the school that it referred to as '*threatening*,'" there is nothing in the record that reflects such an allegation nor that either Cesar Chavez or Petitioner himself connected the aforementioned conversation to his "filing Charges of Discrimination." Pet.'s Mot. 38; R. at 740 (Position Statement) ("Mr. Diggs became accusatory and argued that the evaluation lacked integrity, was biased and not honest. After Principal Lehar addressed the evaluation and observations with Mr. Diggs, she attempted to end the meeting. Mr. Diggs remained and began to threaten legal action, repeatedly saying that 'this is going to court.' Principal Lehar told Mr. Diggs that she was uncomfortable with the direction of the conversation and terminated it."). As noted by OHR, there is no record evidence that Ms. Lehar or any other Cesar Chavez employee attempted to "dissuade Petitioner from filing any actions" or that Ms. Lehar was "uncomfortable" with Petitioner exercising his rights. OHR Br. in Opp'n 19. Thus, the Court agrees with OHR and finds that the exchange with Ms. Lehar is not indicative of any retaliatory animus.

In sum, the Court finds that Petitioner's proffered allegations of pretext are not reasonable, *see Smith v. D.C. Off. of Hum. Rts.*, 77 A.3d 980, 993 (D.C. 2013), and therefore cannot find that Petitioner has met his burden. Ultimately, this Court has no grounds to disturb OHR's finding of No Probable Cause. *See Wash. Metro. Area Transit Auth. v. D.C. Dep't of Empl. Servs.*, 992 A.2d 1276, 1283 n.5 (D.C. 2010) (noting that under the substantial evidence standard, the court can disturb an agency's findings "only if the record compels a contrary conclusion," meaning that the finding was "contrary to the overwhelming weight of the evidence

in the record as a whole").

## II.     Disparate Treatment: Whether Substantial Evidence Supports OHR's Conclusion that Cesar Chavez's Non-Renewal of Petitioner's Contract was not Based on Petitioner's Sex, Sexual Orientation, or Disability.

Petitioner argues that OHR erred in its finding that Petitioner had failed to establish a *prima facie* disparate treatment claim. *See* Pet.'s Mot. 28. OHR determined that Petitioner did not establish "an inference of discrimination on his claim of the non-renewal of his employment contract with respect to either his sex (male), sexual orientation (gay), or disability (Generalized Anxiety Disorder; Major Depressive Disorder)" and thus could not establish a *prima facie* claim of disparate treatment. OHR Br. in Opp'n 20.

The DCHRA prohibits an employer from taking an adverse action against an employee "wholly or partially for a discriminatory reason based upon the actual or perceived . . . sex, . . . sexual orientation, . . . [or] disability." D.C. Code. § 2-1402.11. "Broadly speaking, to state a *prima facie* claim of disparate treatment discrimination, the plaintiff must establish that (1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Furline v. Morrison*, 953 A.2d 344, 353 n.24 (D.C. 2008) (internal citations and quotations omitted). Stated differently, Petitioner had to show "(1) [he] is a member of a protected class; (2) [he] was qualified for the position from which terminated; (3) [he] was terminated in spite of [his] qualifications for the position; and (4) a substantial factor for the termination was that [he] is a member of the protected class." *Wallace v. Eckert*, 57 A.3d 943, 956 (D.C. 2012) (citing *Hollins v. Fannie Mae*, 760 A.2d 563, 578 (D.C. 2000)). Ultimately, to establish the *prima facie* case of discrimination in the decision not to renew Petitioner's contract, Petitioner would need to show "that he was fired from a job for which he was qualified while [female, heterosexual, and/or non-disabled

employees], similarly situated to him, were not terminated, but rather treated more leniently." *Hollins*, 760 A.2d at 576.

It is undisputed that Petitioner meets the first prong of the disparate treatment analysis: he is a member of a protected class due to his sex, sexual orientation, and mental health diagnoses. *See* Pet.'s Mot. 28–29; OHR Br. in Opp'n 20. The second prong is easily met as well: Petitioner suffered an adverse employment action when Cesar Chavez did not renew his employment contract for the 2018-2019 school year. There are no allegations that Petitioner was not qualified for the position of music teacher. However, OHR found that the record did not support the inference prong of a *prima facie* disparate treatment claim. Specifically, OHR found that the "record does not support that any [Cesar Chavez] employee or decision-maker ever made an overtly negative comment about his sex, sexual orientation, or disability, or indeed any comment at all," and there was no record evidence that "similarly situated employees were treated better under similar circumstances" Suppl. LOD 36.

Petitioner argued that four other elective teachers who did not share his protected traits were similarly situated to him and had their contracts renewed when Petitioner's contract was not. *See* Pet.'s Mot. 33–36; OHR Br. in Opp'n 20. OHR found that the elective teachers were not "apt comparators" and thus the proffered comparator evidence was irrelevant. Suppl. LOD 36–37.

"An inference of discrimination can be raised by presenting evidence that a similarly situated employee who did not share the protected characteristic engaged in the same conduct, but was treated differently." *Johnson v. District of Columbia*, 225 A.3d 1269, 1280 (D.C. 2020) (quoting *Hollins v. Fannie Mae*, 760 A.2d 563, 578 (D.C. 2000)). "An employee is considered similarly situated to the plaintiff for the purpose of showing disparate treatment when all of the

relevant aspects of the plaintiff's employment situation are nearly identical to those of the other employee." *Hollins*, 760 A.2d at 578 (internal quotations and citations omitted). "The similarity between the two comparators must exist in all relevant aspects of their respective employment circumstances, which would surely include both their rank in the company and the alleged misconduct." *Id.* (citation omitted).

Here, the proffered comparators were a female SAT teacher (sexual orientation and disability status unknown), a female Spanish teacher (sexual orientation and disability status unknown), a male Art teacher (heterosexual, disability status unknown), and a male Health teacher (sexual orientation and disability status unknown). Pet.'s Mot. 35. Again, "[t]he similarity between the two comparators must exist in all relevant aspects of their respective employment circumstances . . . ." *Hollins*, 760 A.2d at 578. As OHR stated, although the alleged comparators all taught electives rather than a core subject (i.e., math or science), none of the comparators taught music. *See* Suppl. LOD 36–37. In addition, Cesar Chavez proffered that it did not renew Petitioner's contract not because he taught an *elective*, but rather because he taught *music*, a subject which Cesar Chavez determined could be offered through cheaper online instruction and for which there was limited potential enrollment at that campus. *See id.* at 21, ¶ 48. Petitioner offered no comparable enrollment concerns regarding other electives. Moreover, two of the four comparators were male, and there is no evidence as to the comparators' sexual orientation or disability.

As to Petitioner's allegation that he was replaced by a less-qualified female music teacher, the Court finds no basis to overturn OHR's findings: the female music teacher in question remained in her position at an entirely different campus and no music teacher was retained at the Capitol Hill campus from the time Petitioner's contract was not renewed to the

date the campus closed. *See* Suppl. LOD 37; R. at 606–07, 1109.

Thus, the Court finds that OHR relied on substantial evidence in the record to support its finding of No Probable Cause on Petitioner's disparate treatment claim.

## CONCLUSION

In reviewing an agency's decision, the court "must examine the agency record to determine whether there is substantial evidence to support the agency's findings of fact and whether the agency's action was arbitrary, capricious, or an abuse of discretion." *D.C. Off. of Hum. Rts. v. D.C. Dep't of Corr.*, 40 A.3d 917, 923 (D.C. 2012). Upon review of the record, the Court finds that there was substantial evidence to support OHR's findings as to each of Petitioner's complaints and finds that OHR's conclusions are in accordance with the applicable law. Therefore, the Court denies Petitioner's Motion for Judicial Review and affirms OHR's Supplemental LOD.

Accordingly, it is this 24th day of October 2024 hereby

**ORDERED** that Petitioner's Motion for Judicial Review is **DENIED**; it is

**FURTHER ORDERED** that Petitioner's Petition for Review of Agency Order or Decision is **DISMISSED**; and it is

**FURTHER ORDERED** that the remote status hearing set for October 25, 2024 at 11:30 AM is hereby **VACATED** and this case is **CLOSED**.

**SO ORDERED**.

_____
Danya A. Dayson
Associate Judge, Superior Court of the District of Columbia

Copies to:

Charles E. Diggs, II
P.O. Box 1821
Hyattsville, MD 20785
*Petitioner Pro Se*

All counsel of record.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KIMBERLY McCLURE, | |
| *Plaintiff*, | Civil Action No. 1:22-cv-624 (ACR) |
| v. | |
| ANTONY J. BLINKEN, Secretary, U.S. Department of State, | |
| *Defendant*. | |

## MEMORANDUM OPINION & ORDER

Plaintiff Kimberly McClure ("Plaintiff"), a Black woman employed by the United States Department of State ("State Department"), sues for race discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964. Defendant Antony J. Blinken ("Defendant"), sued in his official capacity, has moved to dismiss for failure to state a claim. Dkt. 15. For the reasons below, the Court grants Defendant's motion and dismisses the case without prejudice.

## I. BACKGROUND

### A. Factual Background

The Court accepts as true the following well-pled allegations and draws all reasonable inferences from them in Plaintiff's favor. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

Plaintiff is employed by the State Department and currently works in Washington, D.C. Dkt. 13 ¶ 15. From October 6, 2015, to October 7, 2018, she served as an Assistant Public Diplomacy Officer (FS-02 rank) at the U.S. Consulate in Cape Town, South Africa. *Id.* ¶¶ 20, 22, 77. In August 2017, Virginia Blaser, a White woman, became the Consulate's Consul

1

General and Plaintiff's second-line supervisor.  *Id.* ¶¶ 3, 26.  Plaintiff alleges that Blaser "marginalize[d] black employees including Plaintiff, limit[ed] their professional opportunities, and diminish[ed] their accomplishments."  *Id.* ¶ 27.

To start, on her arrival, Blaser disinvited Plaintiff from weekly senior staff meetings that she had previously attended.  *Id.* ¶¶ 45–46.  That same year, Blaser discouraged Plaintiff's supervisor from nominating her for an award because she covered roles only in an acting capacity.  *Id.* ¶¶ 38–41, 42; Dkt. 15-2 at 2.  But Blaser gave an award to a White officer who covered a role only in an acting capacity.  Dkt. 13 ¶ 42.  While Plaintiff received an award after she left Cape Town, the timing diminished its "effect and prestige."  Dkt. 13 ¶ 44.

In April 2018, Blaser participated in Plaintiff's employee evaluation.  *Id.* ¶ 57.  In the evaluation, Blaser "did not include a substantive assessment of Plaintiff's most notable accomplishments, including that she had covered three jobs, serving as Acting [Consul General,] Public Affairs Officer (PAO), and her own position."  *Id.* ¶ 59.  If identified, these accomplishments would have stood out to a promotion board and increased Plaintiff's odds of promotion.  *Id.*  Blaser stated that she did not assess these actions because they occurred prior to her arrival even though she assessed prior work performed by a White employee.  *Id.* ¶¶ 60–61.  Blaser also did not recommend Plaintiff for a promotion, which contributed to her not being promoted.  *Id.* ¶¶ 62, 64–65.

On May 14, 2018, Blaser denied Plaintiff's request to lead a brainstorming session with all consulate employees.  Dkt. 15-2 at 2.  She instead appointed two White officers, who had spent less time in the Consulate than Plaintiff, to lead the session.  Dkt. 13 ¶¶ 47–50.  She also did not select Plaintiff "to lead and organize a mission-wide National Day Celebration" or "to

lead the post's Mandela Day.  *Id.* ¶¶ 51–52.  Again, she instead selected White employees to handle these tasks.  *Id.*

Later in May, Blaser did not designate Plaintiff as eligible to serve as Acting Consul General for one week.  *Id.* ¶ 67.  That omission prevented Plaintiff from serving in that role in 2018, which in turn cost her the opportunity to "interact with high-ranking officials," and "show her leadership skill."  *Id.* ¶¶ 79–80.  Plaintiff alleges that every White officer at FS-02 rank served as Acting Consul General for one week in 2018, but none of the three FS-02 Black officers did.[1]  *Id.* ¶ 68.  Blaser told Plaintiff that she was not selected to serve as Acting Consul General because she had served in that position for three weeks in July 2017, yet other White employees served as Acting Consul General more than once.  *Id.* ¶¶ 24–25, 72–73.  Blaser did designate Plaintiff as eligible to serve as Acting Deputy Post Officer, but that post was "less competitive for promotion purposes."  *Id.* ¶ 70.

Plaintiff also alleges that Blaser mistreated, insulted, and mocked other Black employees, including Blaser's predecessor.  *Id.* ¶ 29.  Blaser also allegedly claimed that her predecessor had "a 'cabal' favoring other black employees and inappropriately favored and elevated black employees."  *Id.* ¶¶ 30–31.  She also allegedly remarked that her "black employees are [her] worst performers."  *Id.* ¶ 37.  Plaintiff does not allege that Blaser made any of these comments in her presence.  *Id.* ¶¶ 29–33, 37.

### B.  Procedural Background

Plaintiff made her initial report of Equal Employment Opportunity ("EEO") violations to the State Department's Office of Civil Rights ("OCR") on June 22, 2018.  *Id.* ¶ 9.  She requested

---

[1] Blaser selected one Black officer to serve as Acting Consul General for one weekend day.  Dkt. 13 ¶ 76.  Plaintiff dismisses this as a "null" opportunity.  *Id.*

informal EEO counseling on July 6, 2018, and filed an EEO complaint on August 14, 2018.  *Id.*

On October 19, 2018, OCR accepted the following race discrimination allegations for

investigation: (1) "Your performance evaluation for the period ending April 2018 did not contain

salient accomplishments or a recommendation for promotion"; (2) "On May 14, 2018, you were

denied the opportunity to organize a brainstorming session"; (3) "On June 21, 2018, you learned

you were excluded from an opportunity to act as Consul General in Cape Town, South Africa";

and (4) "You were subjected to a hostile work environment characterized by, but not limited to

unfair work assignments, denigrating comments, and denial of professional opportunities."  Dkt.

15-3 at 1–2.  OCR dismissed as untimely Plaintiff's allegation that Blaser discouraged her

nomination for an award.  *Id.* at 5–7.  Following the completion of an investigation into

Plaintiff's formal EEO complaint, an Equal Employment Opportunity Commission

Administrative Judge dismissed Plaintiff's case on November 1, 2021.  Dkt. 13 ¶ 10–11.

Plaintiff filed a Complaint in this Court on March 7, 2022.  Dkt. 1.  On July 15, 2022,

Defendant filed a Motion to Dismiss.  Dkt. 11.  In response, Plaintiff filed an Amended

Complaint on August 4, 2022.  Dkt. 13.  Defendant now moves to dismiss the suit.  Dkt. 15.

## II.  LEGAL STANDARD

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a

complaint must set forth "a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

U.S. at 556).  In reviewing the motion, the Court accepts as true plaintiff's factual allegations and

"grant[s] plaintiff the benefit of all inferences that can be derived from the facts alleged."

*Sparrow*, 216 F.3d at 1113.

## III. ANALYSIS

### A. Race Discrimination (Count I)

#### 1. *Timely Exhaustion of Administrative Remedies*

Defendant argues that Plaintiff did not timely exhaust her administrative remedies for most of the alleged incidents. Federal employees alleging discrimination in violation of Title VII must exhaust administrative remedies before suing in federal court. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). To do so, they "must initiate contact with a[n] [EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see also Weber v. Battista*, 494 F.3d 179, 182–83 (D.C. Cir. 2007). This 45-day limit may be extended if the employee shows that he or she "did not know and reasonably should not have . . . known that the discriminatory matter or personnel action occurred...." 29 C.F.R. § 1614.105(a)(2).

Defendant does not help its cause by providing inconsistent arguments about what date the 45-day limit began and which allegations are time-barred.[2] In its analysis, the Court uses the dates in Plaintiff's Amended Complaint and the official State Department and EEO documents.[3] Plaintiff alleges that she made her initial report to OCR on June 22, 2018, Dkt. 13 ¶ 9; she is thus

---

[2] Defendant contends in its opening brief that the 45-day clock starts backwards from July 6, 2018; however, in its reply, Defendant states that the relevant date is June 22, 2018. *See* Dkt. 15 at 13; Dkt. 20 at 2. Defendant therefore offers contradictory positions of whether two specific events are time-barred: (1) Plaintiff's exclusion from the list of employees to serve as Acting Consul General and (2) Blaser's denial of Plaintiff's request to lead a brainstorming session. *See* Dkt. 15 at 15–17; Dkt. 20 at 2.

[3] The Court takes judicial notice of the official State Department and EEO documents referenced in Plaintiff's Amended Complaint and attached to Defendant's Motion to Dismiss. *See* Dkt. 13 ¶¶ 9–15; Dkt. 15; *Spence v. Wolf*, 2020 WL 6075727, at *3 (D.D.C. Oct. 15, 2020).

time-barred from making a discrimination claim based on any event that occurred before May 8, 2018.[4]  The following alleged acts of discrimination therefore fail as untimely: (1) Blaser recommended that Plaintiff not receive an award (October 2017); (2) Blaser excluded Plaintiff from senior staff weekly meetings (October 2017); and (3) Blaser submitted an incomplete employee evaluation (April 2018).  For good reason, Plaintiff does not claim otherwise in her opposition.

## 2. *Discrimination Analysis*

Plaintiff does bring two timely allegations: (1) Blaser denied Plaintiff's request to lead a brainstorming session (May 14, 2018); and (2) Blaser did not include Plaintiff on the list of employees eligible to serve as Acting Consul General for one week (May 23, 2018).  Dkt. 13 ¶¶ 47–50, 67.

As to these claims, Defendant argues that Plaintiff has not stated a plausible claim to relief.  To establish a *prima facie* case of discrimination, a plaintiff must show that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quotations omitted); *see also McCallum v. Mayorkas*, 2023 WL 3203011, at *9 (D.D.C. May 2, 2023).  While a plaintiff need not plead each element of a *prima facie* case of discrimination to survive a motion to dismiss, a plaintiff must nevertheless plead sufficient facts to support such a claim.  *See Sparrow*, 216 F.3d at 1114; *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011).

---

[4] The Court assumes—without deciding—that Plaintiff's initial report to OCR qualifies as "initiat[ing] contact with a[n] [EEO] Counselor" under 29 C.F.R. § 1614.105(a)(1).  Defendant concedes as much in its reply brief.  Dkt. 20 at 2.

6

Plaintiff's first claim is easy to address. Blaser's decision to have someone other than Plaintiff lead a brainstorming session was not an actionable adverse employment action. Such a decision "fall[s] into the category of a supervisor's ordinary workplace exercise of authority that did not adversely affect the conditions of plaintiff's employment." *Heavans v. Dodaro*, 2022 WL 17904237, at *8 (D.D.C. Dec. 23, 2022). Plaintiff does not contend otherwise.

The second claim fails for the same reason—Blaser's decision not to permit Plaintiff to serve as Acting Consul General is not an actionable adverse employment action. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011); *see also Heavans*, 2022 WL 17904237, at *7.

To find an adverse employment action, the D.C. Circuit, until recently, required courts to conclude that "a reasonable trier of fact could find objectively tangible harm" based on "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). In *Chambers v. District of Columbia*, the D.C. Circuit invalidated that rule and held instead that an adverse employment action can exist despite a lack of "objectively tangible harm" like economic impact. 35 F.4th 870, 874–75 (D.C. Cir. 2022) (en banc) (addressing an employee's forced transfer or denial of a transfer request).

Yet "[e]ven post-*Chambers*, [a] plaintiff cannot avoid dismissal of her Title VII discrimination claim by baldly stating that the alleged employment action adversely affected the terms, conditions, or privileges of employment without proffering supporting facts or allegations." *Black v. Guzman*, 2023 WL 3055427, at *8 (D.D.C. Apr. 24, 2023). Plaintiff

provides no supporting facts or allegations that Blaser's decision not to permit Plaintiff to serve as Acting Consul General for one week affected the "terms, conditions, or privileges" of her employment. *Id.* Nor could she. The "denial of a temporary designation is not one of the terms, conditions, or privileges of employment contemplated by Title VII." *Brewer v. Holder*, 20 F. Supp. 3d 4, 27 (D.D.C. 2013), *amended in part*, 2013 WL 12399112 (D.D.C. Dec. 16, 2013). "Therefore, denial of an acting position—without showing some further harm—does not by itself qualify as an adverse employment action." *Id.* (cleaned up).

Plaintiff's reliance on *Liu v. Georgetown University* is inapposite. *See Liu v. Georgetown Univ.*, 2022 WL 2452611 (D.D.C. July 6, 2022). In *Liu*, the court held that "to present and to take professional credit for one's own work constitutes a 'privilege' of employment as an academic researcher." *Liu*, 2022 WL 2452611, at *6 (cleaned up). The court based its conclusion in part on the definition of "privilege," which is "a right or immunity granted as a peculiar benefit, advantage, or favor, *especially*: such a right or immunity attached specifically to a position or an office." *Id.* (quoting Privilege, Merriam-Webster, https://www.merriam-webster.com/dictionary/privilege (last visited July 11, 2022)). Here, Plaintiff claims that the opportunity would have afforded her the "ability to interact with high-ranking officials," Dkt. 13 ¶ 79, and "show her leadership skills," *id.* ¶ 80. The Court accepts this as true for present purposes. But Plaintiff does not allege—nor could she—that the opportunity to serve as Acting Consul General for one week is a "privilege" or "right" of her employment as a foreign service officer. Indeed, the fact that one had to be designated by a superior as eligible for the post before being considered indicates the opposite.

Plaintiff also cites *Holcomb v. Powell* for the proposition that "an extraordinary reduction in responsibilities that persisted for years" constitutes an adverse action. Dkt. 16 at 9 (citing

*Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)). But Plaintiff does not allege that the denial of an opportunity to serve as Acting Consul General for one week reduced her responsibilities.[5] Even if she had made the allegation, that reduction was not ongoing "for years," given that she served in the role in 2017 and left the consulate in late 2018.

For these reasons, the Court grants Defendant's Motion to Dismiss Plaintiff's claim of race discrimination.

### B.      Hostile Work Environment (Count II)

Defendant also moves to dismiss Plaintiff's hostile work environment claim for failure to state a claim. *See* Dkt. 15 at 23–26. To establish a *prima facie* case of hostile work environment, a plaintiff must show that: "(1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment occurred because of her race . . . ; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it." *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 77 (D.D.C. 2005), *aff'd,* 187 F. App'x. 1 (D.C. Cir. 2006). While a plaintiff need not plead each element of a *prima facie* case of hostile work environment to survive a motion to dismiss, a plaintiff must nevertheless plead sufficient facts to support such a claim. *See Sparrow*, 216 F.3d at 1114; *Hoskins v. Howard Univ.,* 839 F. Supp. 2d 268, 277 (D.D.C. 2012).

"To prevail on a hostile work environment claim, a plaintiff must show that [her] employer subjected [her] to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

[5] Plaintiff does argue this in her Opposition. Dkt. 16 at 10. But she makes no such allegation in her Amended Complaint. A plaintiff cannot amend her complaint through her opposition to a motion to dismiss. *See Perkins v. Vance-Cooks,* 886 F. Supp. 2d 22, 29 n.5 (D.D.C. 2012).

working environment." *Baird v. Gotbaum*, 662 F.3d at 1250 (internal quotation marks omitted).

"'[C]onduct must be extreme to amount to a change in the terms and conditions of employment.'

For example, 'simple teasing, offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the terms and conditions of

employment.'" *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher v. City

of Boca Raton*, 524 U.S. 775, 788 (1998)). "To determine whether a hostile work environment

exists, the court looks to the totality of the circumstances, including the frequency of the

discriminatory [or retaliatory] conduct, its severity, its offensiveness, and whether it interferes

with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir.

2008); *see also Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 152

(D.D.C. 2013). "[O]rdinary tribulations of the workplace" do not create a hostile work

environment. *Faragher*, 524 U.S. at 788 (quoting B. Lindemann & D. Kadue, Sexual

Harassment in Employment Law 175 (1992)).

 Plaintiff alleges "ordinary tribulations" that mirror claims that courts in this district have

held are insufficient.[6] Plaintiff primarily claims that Blaser did not afford her certain

professional opportunities. As discussed above, Blaser removed Plaintiff from weekly senior

staff meetings, denied Plaintiff's request to lead a "brainstorming session," and did not choose

Plaintiff to serve as Acting Consul General for a week-long period. Dkt. 13 ¶¶ 49–50, 67. Each

time, Blaser gave White co-workers those same professional opportunities. *Id.* ¶¶ 49, 68. Blaser

also did not include certain relevant experience in Plaintiff's performance evaluation, did not

---

[6] The Court need not resolve which of Plaintiff's allegations are time-barred on this claim. Even if Plaintiff's time-barred allegations "occurring outside the statutory period are *sufficiently related* to those incidents occurring within the statutory period as to form one continuous hostile work environment," the claim still fails. *See Baird*, 662 F.3d at 1251 (cleaned up).

explicitly recommend her for a promotion, and discouraged another staff member from nominating her for an award.  *Id.* ¶¶ 60, 64, 39.

Although these issues may indicate a fraught workplace, "[o]ccasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile work environment." *Bell v. Gonzales,* 398 F. Supp. 2d 78, 92 (D.D.C. 2005); *see also Horsey v. United States Dep't of State*, 387 F. Supp. 3d 97, 111 (D.D.C. 2019), *aff'd*, 805 F. App'x 10 (D.C. Cir. 2020).  For example, "non-selection for a desirable position" or "the removal of important assignments [and] lowered performance evaluations" do not establish a hostile work environment.  *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6–7 (D.D.C. 2012), *aff'd*, 748 F.3d 1273 (D.C. Cir. 2014); *see also Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 93–94 (D.D.C. 2009) (citing *Bell*, 398 F. Supp. 2d at 92).  Indeed, "courts have generally rejected hostile work environment claims that are based on work-related actions by supervisors." *Grosdidier v. Chairman, Broad. Bd. of Governors,* 774 F. Supp. 2d 76, 110–11 (D.D.C. 2011).  That is so because "[a]llegations of undesirable job assignment or modified job functions and of [a supervisor's] unprofessional and offensive treatment are not sufficient to establish that [the plaintiff's] work environment was permeated with discriminatory intimidation, ridicule, and insult." *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) (cleaned up), *aff'd*, 407 F. App'x 490 (D.C. Cir. 2011).  Same too for "the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management." *Nurriddin,* 674 F. Supp. 2d at 94.

Thus, this court has held, in a case with more egregious facts than this one, that exclusion from the informal chain of command, close monitoring of work, missed opportunities for teaching, travel, and high-profile assignments, and reassignment to another unit did not amount

11

to a hostile work environment because "they cannot fairly be labeled abusive or offensive."
*Bell,* 398 F. Supp. 2d at 92; *see also Rene v. Granholm*, 2022 WL 17820342, at *7 (D.D.C. Dec.
20, 2022) (finding that plaintiff's allegations of a lack of training, mentoring, and favorable work
opportunities "do not meet the high bar required of hostile-environment claims."); *Routier v.
Ross*, 2018 WL 5251743, at *4 (D.D.C. Oct. 22, 2018) (finding that plaintiff's allegations that
his supervisor criticized his poor performance, failed to give him an award, and gave him poor
ratings in performance evaluations is "par for the course in a typical workplace and, as such, is
insufficient to constitute a hostile work environment").  Plaintiff's allegations of Blaser's
unprofessional supervision therefore do not show that Plaintiff's workplace was permeated with
discriminatory intimidation, ridicule, and insult sufficient to create an abusive working
environment.

Although Plaintiff alleges that Blaser made racist comments about other Black
employees, Plaintiff does not allege Blaser made these comments in her presence or that they
were directed to her.  "Comments made outside of the employee's presence are generally not
actionable as the basis for a hostile work environment claim." *Bergbauer v. Mabus*, 934 F.
Supp. 2d 55, 91 (D.D.C. 2013); *see also Stewart v. Fed. Commc'ns Comm'n*, 177 F. Supp. 3d
158, 168 (D.D.C.), *modified on reconsideration*, 189 F. Supp. 3d 170 (D.D.C. 2016) (explaining
that "conduct directed at others is considered less hostile").  Although "second-hand gossip may
be . . . unpleasant to hear, [ ] it lacks the severity or pervasiveness necessary to affect the terms or
conditions of employment and to give rise to an environment that is subjectively and objectively
hostile." *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 117 (D.D.C. 2015); *see also
Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005), *aff'd sub nom. Nurriddin v. Griffin*,
222 F. App'x 5 (D.C. Cir. 2007).

12

Plaintiff falls far short of alleging conduct that amounts to "intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

For these reasons, the Court grants Defendant's Motion to Dismiss Plaintiff's claim of a hostile work environment.

## IV.  CONCLUSION AND ORDER

It is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 15) is GRANTED. Plaintiff's Amended Complaint is DISMISSED without prejudice.

This is a final appealable Order.  *See* Fed. R. App. P. 4(a).


Date: July 13, 2023

_____
ANA C. REYES
United States District Judge